# EXHIBIT 6

1      the -- for the process.
2      We were advised that the two task force
3      officers who were already in place did -- would not
4      have to interview if they did not want to, but that
5      they submitted their application, they would be
6      moved to the next step.  We were told that after we
7      conducted interviews, then we would determine from
8      the interviews who we wanted to, from that group,
9      move to the next step.  And then once we were at
10     the next step, we would be able to decide who we
11     wanted as task force officers.
12 Q  So, let me make sure I'm understanding you
13     correctly.
14     So, South Bend was going to send you a slate of
15     candidates, plus -- plus, the two TFOs who were
16     already there and then you were going to interview
17     and -- and interview those people and pick from
18     that -- that group?
19 A  We were advised that they would make the position
20     available to all officers at the police department
21     as long as they met some criteria.  And I don't
22     know exactly what the criteria was for the South
23     Bend Police Department.  They advised that we would
24     interview those individuals.  They also said that
25     the two sitting task force officers, which were

1　　　Sheldon Scott and Bayne Bennett, as long as they
2　　　submitted their application, they did not have to
3　　　interview, but that they would -- they could
4　　　interview if they wanted to, but that they would
5　　　automatically move to the second step of the
6　　　process.
7　Q　Okay.  And the second step was -- was for -- was
8　　　interviews of -- of -- interviews by ATF personnel?
9　A　The second step was pretty vague by the South Bend
10　　　Police Department.
11　Q　Pretty vague?
12　A　Yes.
13　Q　How -- how was it vague?
14　A　After we conducted the interviews of the
15　　　applicants, ATF asked South Bend Police Department
16　　　do we need to conduct further interviews, and South
17　　　Bend Police Department left it up to ATF if we
18　　　wanted to do further interviews or not.
19　Q　Did you want to?
20　A　After speaking with the special agent in charge and
21　　　acting resident agent in charge, it was determined
22　　　that no further interviews needed to be conducted.
23　Q　And at that point you were able to make -- make a
24　　　decision?
25　A　The ATF was able to make a decision.

1  Q  Okay.  What was the decision?
2  A  The decision was to retain Task Force Officer Bayne
3     Bennett and select Brandon Stec as a task force
4     officer.
5  Q  Who made that decision or those decisions?
6  A  The assistant special agent in charge.
7  Q  Was that Scott McCart?
8  A  It was not.
9  Q  Who?  I'm sorry, who was that?
10 A  Brendan Iber.
11 Q  Who participated in that decision?
12 A  Myself and the acting resident and special agent in
13    charge, Sean Skender.  I'm sorry, the acting
14    resident in charge.
15 Q  Okay.  And that was Mr. Skender?
16 A  Yes.
17 Q  Okay.  So the three of you decided jointly?
18 A  Yes.
19 Q  Who informed the candidates of the decision?
20 A  I believe Captain Biggs from South Bend Police
21    Department.
22 Q  Okay.  No one from ATF, in other words?
23 A  No.
24              MR. McQUARY:  Okay.  We have
25         been at it for about an hour.  I'd

1　Q　What was the reason for -- let's strike that.
2　　　Who decided not to renew James Taylor's
3　　credentials with the ATF?
4　A　It was the resident agent in charge at the time,
5　　which was Scott McCart.
6　Q　And did you ever learn of the reason for not
7　　renewing James Taylor's credentials with the ATF?
8　A　Yes.  Actually, Resident Agent in Charge Scott
9　　McCart reached out to me and asked if I had any
10　　cases with him, if he had provided any paperwork or
11　　had been involved in any type of casework that we
12　　had, and I said not that I could recall.  And then
13　　McCart said that he was going to let the
14　　credentials expire, and that -- that could be
15　　something revisited to bring him back on at a later
16　　date, if we found it necessary.  But that due to
17　　the lack of involvement, he was going to let the
18　　credentials expire.
19　Q　The lack of James Taylor's involvement?
20　A　Correct.
21　Q　Involvement in what?
22　A　In any ATF cases, providing any information for
23　　cases.  There just was no -- it didn't seem like it
24　　was beneficial on the ATF's part to continue to
25　　renew his credentials because it's quite labor

1   intensive to -- to do the reinstatement or the
2   continuation.
3 Q When was Brandon Stec a special deputy?
4 A I believe he was assigned as a special deputy in
5   2017 or '18.  I don't know the exact time.  I think
6   2017 or '18.
7 Q Do you know for how long Brandon Stec was a special
8   deputy?
9 A I believe up all the way to the point where he was
10   selected to the full-time task force officer, he
11   was a special deputy.  So there was one -- at least
12   one reinstatement for his special deputy
13   credentials prior to him being a full-time task
14   force officer.
15 Q Did the fact that Brandon Stec was a special deputy
16   factor in to the decision to appoint him as a task
17   force officer with the ATF in 2020?
18 A It did.
19 Q Previously, you were asked whether you were aware
20   that Sheldon Scott was an armorer.  What is an
21   armorer?
22 A I think that what they're referencing is like an
23   armorer for a specific firearms manufacturer to
24   get -- somebody who can work on or make adjustments
25   to specific firearms.  Glock has a Glock armorer,