# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | |
|---|---|
| SHELDON SCOTT and JAMES TAYLOR, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 3:21-cv-00223-DRL-MGG |
| | ) |
| CITY OF SOUTH BEND, SCOTT A. | ) |
| RUSZKOWSKI, Individually and in his | ) |
| Official Capacity as Chief of Police, | ) |
| TIMOTHY LANCASTER, | ) |
| JASON BIGGS, KAYLA MILLER, and | ) |
| MERRICK GARLAND, | ) |
| in his official capacity | ) |
| as the U.S. Attorney General, | ) |
| | ) |
| Defendants. | ) |

## SOUTH BEND DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to N.D. Ind. L.R. 56-1, Defendants City of South Bend, Scott A. Ruszkowski, Individually and in his Official Capacity as Chief of Police, Timothy Lancaster, Jason Biggs, and Kayla Miller (collectively "South Bend Defendants"), by counsel, respectfully submit the following Statement of Material Facts in Support of their Motion for Summary Judgment:[1]

### A.    The Plaintiffs and Their Employment with the City of South Bend

1.    Plaintiff Sheldon Scott ("Scott") worked for the City of South Bend Police Department since April 21, 2003. (Scott Dep. 14:21-23).[2]

2.    Scott worked as a full-time Task Force Officer with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") from 2010 to 2020. (Scott Dep. 60:8-11; 16:22-23). After his service as

---

[1] The evidentiary materials cited herein are attached to the South Bend Defendants' Index of Exhibits filed contemporaneously herewith.

[2] At the time of Scott's deposition on March 20, 2023, Scott was still employed by the City of South Bend Police Department. However, Scott retired on April 25, 2023. (Ruszkowski Aff. ¶ 16).

a Task Force Officer ended, Scott returned to midnight patrol. (Scott Dep. 17:12-16).

3.    A Task Force Officer is a police officer who remains employed by their department but is specifically assigned to a federal agency and assists that agency, and its locally assigned agents, with law enforcement activities in the community. (Ruszkowski Dep. 56:8-18). The ATF Task Force office is located apart from the South Bend Police Department at 523 East Jefferson Blvd. (Scott Dep. 17:7-9).

4.    As a Task Force Officer, Scott's daily work was monitored by ATF agents. The ATF also approved his overtime, which fluctuated depending on the work to be performed for ATF or could include no overtime at all. (Scott Dep. 18:12-21; 18:25-19:25; 20:1-3).

5.    Plaintiff James Taylor ("Taylor") worked for the City of South Bend Police Department from August 1993 until August 2, 2021. (Taylor Dep. 40:1-5, 28:21-11).

6.    Taylor was promoted to Detective in spring 2005. (Taylor Dep. 24:24-25).  Taylor served as a Detective until his voluntary retirement on August 2, 2021. (Taylor Dep. 28:20).

7.    Taylor served as a special deputy for the ATF starting July 18, 2018. (Taylor Dep. 29:2-6; 275:25-276:3). Unlike a Task Force Officer, special deputies do not serve full time in that role but only have credentials which assist with taking a case to the federal level when needed. (Taylor Dep. 32:16-33:8). The ATF's Resident Agent in Charge, Scott McCart, decided to let Taylor's ATF credentials expire due to his lack of involvement with the Task Force. (Lerch Dep. 85:6-86:2).

**B.    The South Bend Defendants and Their Supervision of the Plaintiffs**

8.    Defendant Scott A. Ruszkowski ("Ruszkowski") has served as the City of South Bend's Chief of Police since October 1, 2015. (Ruszkowski Dep. 75:6-9, 7:20-22).

9.    Timothy Lancaster ("Lancaster") has been the Division Chief for the Detective Bureau at

2

the City of South Bend Police Department since June 2018. (Lancaster Dep. 7:2-11).

10.    Both Scott and Taylor were in Lancaster's chain of command, but he did not serve as their direct supervisor. (Lancaster Dep. 11:2-7; 11:18-21; 12:20-24). Those higher up in the chain of command who do not directly supervise an officer rely on direct supervisors to manage officer performance, ensure reports are completed and timely submitted, and escalate concerns when needed. (Lancaster Dep. 13:3-10; 50:4-21).

11.    Jason Biggs ("Biggs") has been Captain of the Detective Bureau since September 2019. (Biggs Dep. 7:10-11). Before he was promoted to Captain, Biggs served as a Sergeant in the Detective Bureau from 2016 to 2018, and then as a Lieutenant from 2018 to September 2019. (Biggs Dep. 7:1-14). Biggs was Taylor's direct supervisor only during his time as Sergeant in the Detective Bureau. (Biggs Dep. 9:9-13; 28:8-14).

12.    Kayla Miller ("Miller") has been a Lieutenant in the Detective Bureau since October 2021. (Miller Dep. 11:3-4). Prior to that role, Miller was Sergeant in the Detective Bureau from July 2018 to October 2021. (Miller Dep. 11:9-10). While she was a Sergeant, Miller directly supervised both Plaintiffs. (Miller Dep. 22:21-15).

13.    Biggs thought he, Scott, and Taylor were all friends. (Biggs Dep. 48:2-8). Biggs presented Taylor with his retirement badge and plaque, despite the fact that Taylor and Scott already filed this lawsuit. (Biggs Dep. 48:18-21).

14.    When he filed this lawsuit, Taylor approached Miller and told her he considered her a friend and hoped they would be able to continue their friendship. (Miller Dep. 83:1-14).

### C.    Plaintiffs' Intervention in the Tapes Case

15.    On September 14, 2012, the South Bend Common Council filed a lawsuit against the South Bend City Administration concerning recording of telephone lines at the South Bend Police

Department. (*See South Bend Common Council v. South Bend City Administration*, St. Joseph Superior Court, Cause No.: 71D07-1209-MI-00159) (the "Tapes Case").

16.    On February 20, 2018, Taylor, Scott, and Scott Hanley joined the existing lawsuit to stop the release of recorded conversations they had on the SBPD telephone line. (Ruszkowski Dep. Ex. 2; Scott Dep. 10:2-5).  They joined the lawsuit as residents of St. Joseph County, Indiana, not as members of the South Bend Police Department or employees of the City of South Bend.  (Ruszkowski Dep. Ex. 2)

17.    Specifically, Taylor, Scott, and Hanley became involved in the lawsuit because they claim[ed] "a privacy interest in the tapes and/or digital recordings, which allegedly contain recordings of [their] private phone conversations with South Bend Officer Brian Young, which were recorded without [their] consent." (Ruszkowski Dep. Ex. 2; Taylor Dep. 39:17-25). Scott also felt it was inappropriate that others would get to "listen to [his] wife and [him] talk." (Scott Dep. 91:5).

18.    Plaintiffs intervened because the interest of the existing parties in that separate action did not adequately represent their personal interests in the tapes. (Ruszkowski Dep. Ex. 2, ¶¶ 5-6). Additionally, as Plaintiffs noted in their complaint, "The recording of Intervenors' private and personal conversations was done without consent or warrant." (Compl. for Declaratory Judgment at ¶ 14).

19.    Scott first learned that the phone lines were possibly being recorded in 2010. (Scott Dep. 34:17-24). During their depositions, it was suggested to Lancaster and Biggs that Scott complained to the FBI and the U.S. Attorney's Office regarding the alleged illegal recordings; this was the first Lancaster and Biggs learned that Scott made such a complaint. (Lancaster Dep. 61:2-9; Biggs Dep. 41:5-17).

**D.    Material Facts Specific to James Taylor's Claims**

20.    Taylor alleges in this lawsuit that, because of his involvement in the Tapes Case, he was subjected to unwarranted discipline by Lancaster, Biggs, and Miller; he was subjected to Internal Affairs investigations; Ruszkowski took his ATF credentials; the Department gave him a performance improvement plan, and as a result, denied him overtime and outside employment opportunities. (Amend. Compl. ¶¶ 21-25, 36).  Taylor named the City of South Bend as a Defendant because the City failed to protect his rights as an employee, but Taylor could not identify at his deposition any specific action taken by the City in retaliation for his involvement in the Tapes Case.  (Taylor Dep. 240:3-23)

21.    Taylor's career was not free of discipline. On March 3, 2000, Taylor backed into a vehicle that had stopped for his emergency lights after reversing down a street. Taylor was reprimanded by then-Chief Blume for the incident and accepted his discipline. (Taylor Dep. Ex. C; Taylor Dep. 42:22-25).

22.    On November 16, 2001, Taylor was reprimanded again for another vehicle incident where he struck another police cruiser. Again, Taylor accepted the punishment. (Taylor Dep. Ex. D; Taylor Dep. 45:17-20).

23.    On June 1, 2004, Taylor was written up and told to "be careful" after he backed into the SWAT truck. (Taylor Dep. Ex. E; Taylor Dep. 47:13-17).

24.    On January 25, 2011, Taylor, while not wearing his seatbelt, rolled his police cruiser twice after swerving into a yard to avoid hitting a car that made a left turn in front of him. The Department issued Taylor a letter of reprimand due to the incident which Taylor signed. (Taylor Dep. Ex. F; Taylor Dep. 49:17-19).

25.    Starting around 2016 or 2017, Taylor's then-supervisors, Sergeants Elwaer and Biggs, had

attempted to coach Taylor to improve his performance, specifically to better his report writing, but his performance had not improved. (Lancaster Dep. 41:22-43:2; Biggs Dep. 6:15-18, 15:22-25).

26. On November 3, 2016, Taylor was investigated by the South Bend Police Department's Internal Affairs, and issued an Administrative Advisory for completing personal errands while on duty. Specifically, Taylor was spotted by another officer buying solar powered lights at Menards while on duty. Taylor used his police cruiser and was wearing clothing with police markings. Taylor was advised that his conduct was improper and that future incidents would merit discipline. (Taylor Dep. Ex. G; Taylor Dep. 52:14-16).

27. Before Taylor joined the Tapes Case (in February 2018), his performance had already declined and his supervisors had previously undertaken efforts to improve his performance, including through e-mails, coaching, and corrective actions (Lancaster Dep. 51:19-52:4; Biggs Dep. 196:23-194:13).

28. At the time, Biggs was not in the habit of specifically documenting every single performance issue. Later, after completing his degree in August 2018 with a concentration in organization leadership, Biggs applied the lessons he learned and started to capture most performance issues in writing. (Biggs Dep. 19:7-22; 11:7-18).

29. In May 2018, Taylor received a 2017 performance evaluation from then-Lieutenant Biggs that was generally favorable despite concerns about Taylor's performance in 2017. (Lancaster Dep. 96:16-20; Biggs Dep. 7:6-7; Biggs Dep. 20:22-24; Biggs Dep. Ex. 1). The 2017 performance review was the first year the Department had ever required the reviews and Biggs did not want to "mark-up" Taylor's record despite ongoing performance issues. (Biggs Dep. 21:5-13; 22:5-9; 22:11-19; 139:10-12). Additionally, Biggs wanted to be

sensitive to Taylor's personal issues that may have been affecting his work, which included a sick parent and losing a baby late into pregnancy. (Biggs Dep. 96:9-97:25).

30.    Shortly after Lancaster was promoted to Division Chief in June 2018, then-Captain Bontrager informed Lancaster that there had been issues with Taylor's report writing. (Lancaster Dep. 39:2-4). Specifically, Taylor had not included pertinent details in reports, he inserted his own opinions in reports, and he did not complete reports in a timely manner. (Lancaster Dep. 39:7-9; Biggs Dep. 182:5-10). Captain Bontrager also advised Lancaster that at various points other supervisors, including Dave Young and Miller, had been involved in the attempts to correct Taylor's performance issues. (Lancaster Dep. 45:7-18). Captain Bontrager advised that he was going to address Taylor's performance issues. (Lancaster Dep. 39:18-21).  Captain Bontrager sent coaching emails to Taylor, specifically about the report writing errors, and gave him counseling. (Lancaster Dep. 41:1-42:2; Lancaster Dep. 42:21-43:4; Biggs Dep. 16:4-6).

31.    Police reports must be submitted timely and completed accurately. (Lancaster Dep. 52:10-25). Detectives must start their report or a supplement to their report within 72 hours after they are assigned to investigate a case. (Lancaster Dep. 67:1-9). All officers, including detectives, who made an arrest must complete an arrest report before the end of the shift during which the arrest occurred. (Lancaster Dep. 67:23-68:9). If an officer, including a detective, assists in an arrest, they must likewise complete a supplement before the end of the shift if the arrest is for a felony crime. (Lancaster Dep. 68:10-17). Other officers must also comply with this requirement. (Lancaster Dep. 68:18-20).

32.    Reports must be completed in a timely manner because a complete report is required before a suspect can be charged with a crime. Violent suspects can continue to be a threat to the

community unless reports are completed quickly and the prosecutor's office has what it needs to bring charges. (Lancaster Dep. 108:17-25; 109:2-9).

33. Given the nature of their work, detectives are generally held to a much higher standard in their report writing than other officers, and detectives are required to submit reports within 24 to 48 hours depending on the circumstance. (Lancaster Dep. 109:20-25; Biggs Dep. 153:7-24).

34. Taylor struggled with timely starts, timely submission, and the accuracy of his reports. (Lancaster Dep. 53:18-22; 68:21-69:1; Miller Dep. 25:2-6; 79:24-80:5; Biggs Dep. 94:24-95:6)

35. The Department's discipline policies and discipline matrix require that an officer be written up after late submission of reports. (Taylor Dep. 83:2-9; Taylor Dep. Ex. K). Detectives are expected to be responsible for and familiar with Department policies. (Biggs Dep. 219:8-14).

36. When other detectives struggled with report writing, they were also counseled and if they did not reform, received written warnings. (Biggs Dep. 16:10-25; Miller Dep. 25:15-18; Biggs Dep. 94:4-11; 94:15-18). Further, other "officers have been removed from the Detective Bureau for not completing their reports in a timely manner." (Lancaster Dep. 66:1-15).

37. Taylor also retained a high rate of "No Victim Cooperation" reports. In total, Taylor submitted case files with roughly 130-140 No Victim Cooperation reports compared to other detectives who only submitted 20-30. (Lancaster Dep. 56:4-8; Biggs Dep. 146:2-25; 225:11-226:15). Lancaster is not aware of anyone else having as high a rate of No Victim Cooperation cases as Taylor. (Lancaster Dep. 57:2-4; Biggs Dep. 148:16-19; 149:1-5;

149:20-25).

38.    Taylor's unusually high number of cases with No Victim Cooperation is a red flag for supervisors given that, generally speaking, that does not happen. (Lancaster Dep. 56:16-57:4). A report number that high indicates that the detective was not speaking to the victims in a way that shows the detective cares or that the detective may not have spoken to the victim at all. (Lancaster Dep. 56:4-57:3). Additionally, the Department became concerned about the high number of Taylor's No Victim Cooperation cases simultaneously to the general increase of public scrutiny of police; so, the Department especially wanted to make sure that the victims were comfortable working with the detective and happy with the investigation of their cases. (Biggs Dep. 146:5-148:4).

39.    Although Taylor worked to correct issues when brought to his attention, his repeated mistakes and failure to timely start and submit reports diverted his supervisors' time from their own responsibilities and from supervising less experienced detectives. (Lancaster Dep 110:12-17; Biggs Dep. 222:1-21).

40.    Miller and Biggs both attempted to correct Taylor's report writing, submission, and performance on multiple occasions including on November 8, 2019, December 11, 2019, December 26, 2019, January 22, 2020, and January 28, 2020. (Biggs Dep. 115:1-13; 115:18-118:25; Biggs Dep. Ex. 1, pp. 6, 7-8, 9, 10, 14, 15-16). For example, in one instance, Miller counseled Taylor because he submitted a report without all of the information necessary to refer the case for prosecution. (Biggs Dep. 120:1-21; Biggs Dep. Ex. 1, p. 9). In another, Miller coached Taylor to fully pursue all investigatory options, such as video footage, related to a violent carjacking at gun point. (Biggs Dep. 122:15-123:21; Biggs Dep. Ex. 1, p. 10).

41.     On January 11, 2019, Taylor received a written corrective action plan where then-Sergeant Elwaer coached Taylor on expectations of recordkeeping related to arrests. The corrective action was written because Taylor made an arrest on Wednesday, January 9, 2019, but did not complete the arrest report until Friday, January 11, 2019.  Elwaer again reminded Taylor that when an arrest is made there needs to be a report completed before the end of the shift. (Taylor Dep. Ex. J; Taylor Dep. 73:18-75:13; 78:9-11).

42.     Subsequently, on April 15, 2019, Elwaer wrote up Taylor again for untimely report submission. This time, Taylor failed to update a case report before he left for vacation. Taylor thereafter received an email from Elwaer requesting that he update the file immediately upon his return.  Then, after Taylor returned from vacation, he worked an additional week without updating the case as Elwaer requested. (Taylor Dep. Ex. L; Taylor Dep. 85:10-18; Taylor Dep. 86:10-17).

43.     In addition to his reporting issues, Biggs also needed to coach Taylor on avoiding the use of inappropriate words such as "gay" and "butt fuck" in meetings and in front of civilians. (Biggs Dep. 12:18-25; 13:11-14).  In contrast, the Department has suspended other officers for using profane language and mandated that all detectives refrain from using profane language in certain settings. (Lancaster Dep. 101:5-7; Biggs Dep. 14:4-5,).

44.     Taylor was also counseled about his inappropriate attire. (Biggs Dep. 15:7-10). In one instance, on October 5, 2019, Taylor was written up by Sergeant Brad Rohrscheib for wearing the wrong uniform to duty at a Notre Dame football game. (Taylor Dep. Ex. N; Taylor Dep. 105:15-20).

45.     Additionally, Biggs had concerns about Taylor's "routine" disregard for the chain of command when he would bypass his supervisor by contacting the prosecutor's office

10

directly about arrests, even though the supervisor was to be the one to coordinate with the prosecutor's office. (Biggs Dep. 130:5-13; 96:7-97:2).

46.   In 2019, Taylor received a second performance evaluation. The evaluation referenced the fact there had been two coaching sessions to address his performance. (Lancaster Dep. 97:17-25; Taylor Dep Ex. H; pp. 6-9; Taylor Dep. 60:1-8). Sgt. Elwaer completed this evaluation and praised Taylor where warranted, and then noted his issues with using inappropriate language and "engaging cross culturally". (Lancaster Dep. 98:14-20; 99:1-13; 100:13-16; Taylor Dep. 57:13-17; 57:18-58:1; 59:1-12; Miller Dep. 75:15-76:8).

47.   On November 5, 2019, Taylor received a commendation for solving a robbery within twelve hours. (Taylor Dep. Ex. I; Taylor Dep. 72:9-15). Despite his performance issues over this long period, Taylor was issued awards and commendations because Ruszkowski felt Taylor should be praised when he did good work and supported, in the hopes that Taylor would rectify his persistent performance concerns. (Ruszkowski Dep. 82:2-11; 90:9-93:3; 93:17-94:5).

48.   Biggs saw Taylor as a friend, but started to see changes in Taylor's character, case work, and the way he conducted himself. (Biggs Dep. 98:4-9). Although Taylor's performance declined prior to his involvement in the Tapes Case, for which Biggs provided guidance and coaching via email, Biggs and others saw a steeper decline in Taylor's work performance in 2019 and 2020. (Biggs Dep. 196:23-197:13; 198:15-24; 217:3-20; 217:25-218:9).

49.   In January 2020, Lancaster learned from Biggs that there had been multiple emails, coaching, and corrective actions taken in response to Taylor's multiple performance concerns and policy violations, including with respect to report preparation. (Lancaster

Dep. 27:5-57; 38:16-21; 46:8-17; 47:4-48:3; Biggs Dep. 154:5-10; 152:1-11).

50.    On February 13, 2020, Taylor was written up by Biggs and Miller for multiple issues
pertaining to Taylor's reports, including missing pages, failing to document an arrest,
failing to submit interview notes, and failing to complete reports in a timely manner.
(Taylor Dep. Ex. O, pg. 3).  Taylor had already received numerous coaching and counseling
sessions from multiple supervisors including a formal coaching on January 11, 2019, a
verbal warning on April 15, 2019, several informal coaching sessions that were also
documented via email (Taylor Dep. Ex. M; Taylor Dep. 88:4-20; 90:9-12; 90:22-91:10;
91:15-92:10; 93:23-94:21; 94:22-95:12; 95:19-96:4; 96:10-21), and reminders during roll
call in the detective bureau. (Taylor Dep Ex. O, p. 3; Taylor Dep. 113:1-24).

51.    On March 18, 2020, Detective Taylor was issued written discipline after he joined a
January 15, 2020, vehicle pursuit in his unmarked detective vehicle, and then failed to file
a supplemental report detailing his actions during this pursuit despite being asked to do so
over a period of months. (Taylor Dep. Ex. O, pg. 4). Driving an unmarked vehicle in a
pursuit is considered a safety concern because an unmarked vehicle is not as visible, and it
is against department policy. (Biggs Dep. 223:7-23; Lancaster Dep. 79:20-25). While
Taylor had filed the pursuit form, he failed to file the supplemental report. (Taylor Dep.
Ex. O, p. 4; Taylor Dep. 119:18-24; 120:3-16; 121:15-23; Biggs Dep. 58:21-59:11; 63:15-
64:14; 66:9-15; 68:2-20; 78:16-24; 79:4-5; 219:24-220:25). Taylor was told the next day,
on January 16, 2020, by Captain Leszczynski, to do a supplemental report. (Biggs Dep.
136:9-15; 159:9-18). Taylor did not complete the supplemental report. *Id.* An
Administrative Advisory was ultimately sent to Internal Affairs regarding that same
incident on March 19, 2020. (Taylor Dep. Ex. O, p. 5; Biggs Dep. 57:1-12). While the

Administrative Advisory was filed, Biggs could have issued additional discipline for insubordination for Taylor's failure to file the supplemental report but chose not to. (Biggs Dep. 70:6-8).

52. Improper pursuit procedure is a violation of the Department's policies and warrants discipline under its discipline matrix. (Taylor Dep. 123:3-9; Taylor Dep. Ex. K; Biggs Dep. 60:7-10). To Biggs' knowledge, no one else who was involved violated the pursuit policy and Taylor was the only officer under his command involved in the chase. (Biggs Dep. 80:5-13; 80:20-22).

53. Biggs gave Taylor multiple opportunities to fix his performance issues, especially with respect to Taylor's deficiencies related to report writing. Biggs counted 27 different opportunities he tried to help. (Biggs Dep. 49:12-19). Biggs began to feel Taylor was setting a bad precedent for other detectives. (Biggs Dep. 222:2-21).

54. Supervisors have discretion regarding whether to counsel with informal coaching or to issue formal discipline. In most cases, Taylor could have been issued formal discipline. (Biggs Dep. 221:1-22).

55. As a result of the ongoing performance issues, Internal Affairs began investigating Taylor's policy violations and performance deficiencies; this occurred two years after Taylor joined the Tapes Case. (Lancaster Dep. 51:8-18; Biggs Dep. 57:1-5; Biggs Dep. Ex 10; Taylor Dep. Ex. O).

56. On March 23, 2020, Biggs submitted an Administrative Advisory after Taylor executed a drug arrest but again failed to file the arrest report before ending his shift and going off duty, in violation of department policy; the Administrative Advisory also outlined Taylor's ongoing issues with report writing as well as the coaching he received. (Taylor Dep. Ex.

O, pp. 6-8; Taylor Dep. 129:6-9; Biggs Dep. 57:1-12).

57.    Then, on March 26, 2020, after Taylor failed to secure a crime scene before leaving to obtain a search warrant, Miller submitted an Administrative Advisory. (Taylor Dep. Ex. P). When Taylor arrived on the scene, he asked the suspect for a weapon used in the crime and when the suspect refused, Taylor told the suspect that he would return with a search warrant. Once Taylor returned to the suspect, the evidence was gone. Department policy, which Taylor violated, requires an officer to call in backup to secure the scene before leaving to secure a warrant. *Id.* Taylor also failed to complete a supplemental report documenting the damage to the property that had occurred after he left. (Lancaster Dep. 49:1-11; Biggs Dep. 57:9-10; 82:4-6; 82:9-19; 83:3-11; 85:24-86:6; 88:2-7; 88:10-16; 89:3-12; Taylor Dep. Ex. P; Taylor Dep. 132:22-133:3; 133:17-134:3).

58.    As a part of the Internal Affairs inquiry into Taylor's performance, Biggs was directed to complete a shift-level investigation where he collected facts and supporting documentation related to the Administrative Advisories that had been filed and the series of recent progressive disciplines, as well as a false arrest issue. (Biggs Dep. 55:16-56:7; 57:1-21; 83:16-84:10; 194:13-21; 195:18-24; 196:6-12; 196:23-194:13).

59.    In regard to the false arrest, Taylor arrested an individual for robbery and was notified later in the afternoon that it was unlikely that the arrestee was the suspect. (Biggs Dep. 83:16-84:10). Taylor left the mistakenly arrested suspect in jail for at least 24 hours even though he had arrested another suspect, for that same crime, the next day. *Id.*

60.    As a result of the Internal Affairs investigation, Taylor's Administrative Advisories for his failure to timely submit reports and other policy violations, were sustained. (Biggs Dep. Ex. 10; Taylor Dep. Ex. Q; Biggs Dep. 57:13-21; 85:13-18; 92:21-25; 93:3-5; 93:12-19).

14

61.    Taylor does not dispute that he did in fact violate Department policies and failed to timely submit reports, but he believes only he was disciplined.  (Taylor Dep. 131:18-132:3).

62.    In April 2020, Ruszkowski and Lancaster met with Taylor and asked if he had any reason for his performance decline. (Lancaster Dep. 64:10-14). Taylor did not dispute the concerns that had been raised about his performance and took responsibility for some of his mistakes such as failing to timely submit reports (Lancaster Dep. 64:18-65:9; 65:16-25; Ruszkowski Dep. 31:4-19).

63.    During the April 2020 meeting, Taylor explained he was having "home life issues" and "personal issues" that were interfering with his performance at work. (Lancaster Dep. 64:25-65:9).

64.    Around the same time, Taylor met with Biggs, Miller, Lancaster, and Ruszkowski concerning his performance and short-term memory loss, believed to be as a result of vehicle accidents Taylor had been involved in.  (Miller Dep. 84:20-85:15, Miller Dep. Ex. A; Ruszkowski Dep. 31:25-12).  This was not the first Miller learned of Taylor's memory loss. (Miller Dep. 85:13-15).  In 2019, Taylor expressed to Miller that he had short term memory loss and he was concerned he may not be able to be a police officer because of the need to remember details or testify about a case. (Miller Dep. 85:13-86:12).

65.    Chief Ruszkowski, after reviewing information provided to him by Internal Affairs, made the decision to implement a Performance Improvement Plan ("PIP") on May 6, 2020. (Lancaster Dep. 81:16-18; Biggs Dep. 52:21-23, 53:10-22; 161:1-14; Taylor Dep. Ex. Q, pp. 2-5; Taylor Dep. 139:22-140:25; Ruszkowski Dep. 33:6-34:11; Biggs Ex. 10). Lancaster had also reviewed Taylor's performance issues with Chief Ruszkowski and agreed that a PIP "seemed very appropriate under the circumstances," which included a

pattern and history of multiple policy violations and performance issues that persisted despite efforts to improve Taylor's performance. (Lancaster Dep. 82:11-23; 82:25-83:3). The PIP was in effort to help Taylor save his employment, instead of end it. (Ruszkowski Dep. 82:2-11).

66.    As a result of the Internal Affairs investigation of Taylor's conduct and performance, Taylor was also suspended for one-day without pay; pursuant to standard procedure, his firearm and badge were retained during his short suspension. (Biggs Dep. 180:12-181:7; Taylor Dep. Ex. Q).

67.    PIPs are included in the Department's Discipline Matrix as one option to correct an officer's behavior and considered to be a regular part of the South Bend Police Department's performance improvement process. Other officers have been placed on PIPs in the past. (Lancaster Dep. 59:4-12; 60:17-23; Taylor Dep. Ex. K, p. 2; Ruszkowski Dep. 35:10-25).

68.    As part of the PIP, Biggs reviewed Department policies with Taylor pertaining to his work performance and conduct (such as the policies on report preparation and vehicle pursuits, which Taylor violated), as well as investigative requirements and procedures. (Biggs Dep. 172:20-23; 173:2-5; 190:29-25; Biggs Dep. Ex. 1, pp. 98-128). Biggs and Taylor signed each policy. (Biggs Dep. Ex. 1, pp. 98-128).

69.    Also a part of the PIP, Taylor was expected to remain at the Detective Bureau to focus on reviewing and progressing through his No Victim Cooperation cases which dated back to 2016. (Lancaster Dep. 71:4-16; Miller Dep. 60:7-11; Biggs Dep. 162:23-164:15; 165:23-25). However, Taylor could leave the station to follow up on these cases. (Biggs Dep. 166:14-20). Taylor was also allowed to leave as needed if he obtained prior permission

from his supervisor. (Lancaster Dep. 76:6-11; Biggs Dep. 180:1-7).

70.    During the PIP, Taylor was permitted to take half of the afternoon off due to personal issues
       with his family. (Biggs Dep. 169:24-170:2). Biggs and Miller had compassion for Taylor's
       personal situation. (Biggs Dep. 170:2-4; 225:5-10).

71.    Taylor was, in part, required to do this because he had recently been involved in multiple
       patrol calls and vehicle chases, during which he violated Department policies, and the
       Department wanted to reiterate that the PIP was the priority. (Lancaster Dep. 74:11-19).

72.    Chief Ruszkowski additionally wanted Taylor to remain at the station out of concern for
       Taylor's 30 percent memory loss (Ruszkowski Dep. 34:12-23, 78:3-23).  Taylor or others
       could be hurt by Taylor's 70 percent memory recollection.  (Id.)  For instance, if an officer
       forgot their training or the rules on firearms use, it could be devastating to the officer, to
       the community, and the entire Police Department.  (Ruszkowski Dep. 79:17-80:1).  Chief
       Ruszkowski was also concerned that Taylor's memory loss caused his work to suffer and
       it could impair his ability to recollect facts and ensure they are included in reports, as well
       as give testimony in criminal cases.  (Ruszkowski Dep. 31:6-19; 78:24-79:16).

73.    The expectation to remain at the Detective Bureau during working hours is not unusual;
       "multiple employees throughout the entire building [] have that expectation." (Lancaster
       Dep. 75:2-3) If police officers are having serious performance issues, the Department will
       often restrict officers to the station to work on correcting the issues before the officer is
       again allowed to interact with the public, make arrests, or take away citizens' freedoms.
       (Lancaster Dep. 79:7-15).

74.    Although not formally memorialized in writing, it was Lancaster and Biggs' understanding
       that Taylor was not allowed to work overtime during his PIP to ensure he was not

17

overtasked with overtime hours or outside employment and could focus on improving his performance. (Biggs Dep. 175:11-176:24).

75.    Additionally, as part of the PIP, Taylor was required to meet with Miller daily and Miller and Biggs weekly to discuss his activities and progress. (Miller Dep. 59:2-17). These meetings often took place in the afternoon and were face to face. (Biggs Dep. 168:5-14).

76.    Taylor accepted the requirements of the PIP and the suspension. (Taylor Dep. 146:1-12; Taylor Dep. Ex. Q).

77.    At the time, Miller expressed concerns that frequent check-ins with Taylor would divert her attention from her duties and supervising others. She was told it would be understood if the meetings did not take place on any given day due to other matters including Taylor needing to go home to be with his family. (Miller Dep. 59:18-60:6; Ruszkowski Dep. 96:10-97:12; Biggs Dep. 169:5-23). Miller communicated that same expectation with Taylor, stating that the meetings were "a priority" but that it would be understood if they could not get to it. (Miller Dep. 69:12-21). Even when it was not possible to meet with Taylor formally, Miller still had discussions with Taylor throughout the day. (Biggs Dep. 170:5-22; Miller Dep. 82:4-16). Taylor was not penalized in any way if the daily or weekly meetings did not occur, and it did not hinder or delay his completion of the PIP. (Miller Aff., ¶ 8).

78.    While reviewing Taylor's No Victim Cooperation cases during the PIP, it was discovered that some of the victims in Taylor's cases were willing to cooperate. (Biggs Dep. 150:15-23).

79.    During the period of the PIP, Biggs reached out to ATF at the direction of Chief Ruszkowski to understand their perspective on Taylor maintaining his credentials with the

ATF. Kyle Lerch of the ATF advised that they were going to allow Taylor's credentials to expire at the end of July due to Taylor's lack of work performance with them. (Biggs Dep. 178:8-179:12). Specifically, Taylor was not involved with the Task Force and so then-ATF Resident Agent in Charge Scott McCart decided to let Taylor's ATF credentials expire with the option to revisit that decision later if a determination was made by ATF that his participation was necessary. (Lerch Dep. 85:6-86:2).

80.    During the PIP, on July 8, 2020, Taylor disregarded a direct order by Miller when he contacted an outside police agency at Memorial Hospital within 30 minutes after Miller instructed Taylor not to do so. (Biggs Dep. 57:23-25; Biggs Dep. Ex. 11; Taylor Dep. Ex. T.; Taylor Dep. 183:7-9; 185:11-14). The case had been assigned to Detective Bruno Martinsky. (Miller Aff., ¶ 9). Miller instructed Taylor not to reach out to Memorial Hospital because she would assist Detective Martinsky in doing so to establish contact with Memorial Hospital for this and future missing persons cases. (Miller Aff., ¶ 11). Since Detective Martinsky was assigned a large majority of the missing person cases, Miller wanted to take this opportunity to introduce Detective Martinsky to the police contact at Memorial Hospital. (Miller Aff., ¶ 12).

81.    Biggs directed Miller to complete a shift-level advisory related to Taylor's insubordination, which was turned over to Internal Affairs. (Biggs Dep. 207:6-14; Biggs Dep. Ex. 11). The investigation of Taylor's conduct confirmed that he disregarded Miller's directive and also failed to submit a report documenting his actions in Detective Martinsky's investigation. (Ruszkowski Aff., ¶ 6 and Attachment 1).

82.    Chief Ruszkowski's concerns about Taylor's behavior, performance, and memory loss continued during the period of the PIP. (Ruszkowski Aff., ¶ 8). Upon receiving the

Administrative Advisory and the Internal Affairs report concerning Taylor's July 8, 2020 insubordination, Chief Ruszkowski contacted Human Resources for guidance. (Ruszkowski Aff., ¶ 9).

83. Human Resources recommended that Taylor be placed on light duty status until a fit for duty evaluation is completed. (Ruszkowski Aff., ¶ 10). Chief Ruszkowski agreed with the recommendation and noted on the Administrative Advisory that Taylor had only completed three of the eight PIP items and Taylor will be sent for a fit for duty evaluation. (Ruszkowski Aff., ¶ 11 and Attachment 1).

84. On September 15, 2020, Human Resources notified Taylor that he has been placed on light duty status pending completion of a fitness for duty evaluation. (Taylor Dep. Ex. R; Taylor Dep. 116:20-117:16; 167:21-24). While Taylor was on light duty, he was asked to continue working on reviewing case reports. (Taylor Dep. Ex. R., p. 2; Taylor Dep. 167:7-13). He was not allowed to work overtime or any part-time employment, wear police attire outside of the station, have his gun or badge visible outside of the station, or leave the station except for meals. (Taylor Dep. Ex. R., p. 3; Taylor Dep. 162:4-7, 163:15-164:8; Lancaster Dep. 77:5-7).

85. On September 28, 2020, Taylor was returned to full duty status. (Taylor Dep. Ex. R., p. 4). That same day, Taylor was informed that he successfully completed the Performance Improvement Plan. (Lancaster Dep. 84: 10-14; Taylor Dep. Ex. R., p. 4).

86. Neither Lancaster, Biggs, Ruszkowski, nor Miller ever told Taylor that he was being disciplined due to his involvement in the Tapes Case. (Taylor Dep. 238:18-21).

87. Human Resources never told Taylor that he was being disciplined due to his involvement in the Tapes Case. (Taylor Dep. 238:24-239:3).

88.  Biggs and others had tried to help Taylor with his report writing and other concerns with coaching and emails, but in hindsight, they could have addressed Taylor's performance problems by starting progressive discipline significantly sooner. (Biggs Dep. 51:3-11; 224:9-24).  Unfortunately, although they wanted Taylor to succeed, Taylor's performance never turned around following these informal measures to help him perform and follow department rules and policies.  (Biggs Dep. 224:9-24).

89.  In comparison, Officer Lauren Slisher was placed on a performance improvement plan after she committed a March 13, 2022 pursuit policy violation and a subsequent March 29, 2022 pursuit policy violation where she operated her department vehicle outside of approved standards. (Ruszkowski Affidavit, ¶ 13 and Attachment 2).

90.  On May 24, 2022, Officer Lauren Slisher was the subject of an administrative investigation after her third violation of the Department's pursuit policies. Specifically, during a May 22, 2022 pursuit Officer Slisher disregarded traffic control devices, did not activate her lights and sirens appropriate, and drove her vehicle in an unsafe manner. As a result of that investigation and due to her third violation of Department pursuit policies Officer Slisher was given a letter of reprimand, a six-day suspension without pay, mandatory training, and six more months where she was ineligible for promotion. (Ruszkowski Affidavit, ¶ 14 and Attachment 3).

### E.    Material Facts Specific to Sheldon Scott's Claims

91.  Scott alleged in the Amended Complaint that he was retaliated against when the City and the Chief instituted term limits and allowed other officers to apply for Scott's position as an ATF Task Force Officer. (Amend. Compl. ¶¶ 28, 35).

92.  After Scott joined the Tapes Case on February 20, 2018, Scott received performance

21

evaluations in 2018 and 2019. (Scott Dep. Ex. M; Scott Dep. 170:16-23). In those evaluations, Scott was required to complete a self-evaluation and Biggs evaluated Scott even more favorably than Scott rated himself. (Scott Dep. 171:1-21).

93.  In late 2019 and early 2020, the Department investigated multiple officers assigned to the Drug Investigation Unit ("DIU") based on a complaint submitted by then-Commander Dave Wells about another officer. (Scott Dep. 37:23-38:7; 39:19-25; 41:3-13). The DIU was a joint investigative unit managed by the Prosecutor's Office that Scott was assigned to in addition to his responsibilities with the ATF. (Ruszkowski Dep. 44:3-45:23). Scott earned additional overtime on a weekly basis due to his work with the DIU. (Scott Dep. 24:14-23; 25:18-22).

94.  During that investigation, it came to light that Scott and a deputy prosecutor were drinking at a bar after they had been out on a warrant call, the prosecutor slapped Scott, and Scott responded by punching the prosecutor in the head. (Scott Dep. 49:12-23; 50:20-25; 51:20-21; 52:3-5; 74:16-18). Scott was wearing his service pistol at the time. *Id.* Scott did not report this incident to the Department as he felt he was acting in self-defense and felt like everyone already knew about it. (Scott Dep. 52:11-23; 53:17-22; 71:24-72:1). Scott does not know whether he would have been recognizable to others as a police officer when he punched the prosecutor. (Scott Dep. 75:9-13).

95.  South Bend Police Department Policy 320 requires that employees behave, even when off duty, in a manner consistent with Department policy. (Scott Dep. 66:9-15; 68:9-13; 69:15-24; 70:4-21). Specifically, the policy states that "Members shall conduct themselves, whether on- or off-duty, in accordance with the United States and Indiana Constitutions and all applicable laws, ordinances and rules enacted or established pursuant to legal

22

authority." (Scott Dep. Ex. D., p. 2). Department policy also bans "Unauthorized or unlawful fighting, threatening or attempting to inflict unlawful bodily harm on another" (Scott Dep. 73:1-25; Scott Dep. Ex. D, p. 6) as well as "criminal, dishonest, or disgraceful" conduct on or off duty and conduct any member knows or reasonably should know is unbecoming. *Id.*

96.   Despite Scott's conduct in punching a deputy prosecutor, which violated multiple Department policies, he was not issued disciplined, though Chief Ruszkowski could have disciplined him. (Ruszkowski Dep. 84:21-25; Scott Dep. 75:16-76:10).

97.   The investigation also uncovered a lack of oversight with the DIU, which resulted in other policy violations. (Scott Dep. 57:5-20; Scott Dep Ex. C, pp. 1-3). Scott was the Assistant Commander of the DIU and had supervisory responsibilities. (Scott Dep. 23:13-24:6).

98.   The DIU was disbanded by the Prosecutor's Office shortly after the investigation. (Ruszkowski Dep. 83:1-85:13; 50:3-9; Scott Dep. Ex. C, pp. 1-3). All officers were returned to the Police Department, except for Scott who stayed in his ATF assignment. (Scott Dep. 59:1-7; 57:21-23; Scott Dep. Ex. C., p. 3).

99.   Scott does not have any reason to believe that the Department investigated the DIU for any other reason than the report of misconduct. (Scott Dep. 41:3-13; 42:22-43:3; 43:25-44:6).

100.   In early 2016, the South Bend Police Department instituted "term limits" on how long a non-patrol officer can serve in a particular assignment before it is necessary to reapply for the role. (Lancaster Dep. 87:2-11; Biggs. Dep. 29:16-17; Ruszkowski Dep. 43:23-44:2). The purpose of term limits is to ensure that all officers have opportunities to pursue specialized positions and to safeguard officer's mental health by ensuring diversity in their assignments and exposure. (Biggs Dep. 30:7-8; 30:21-31:5).

23

101.    Term limits apply to specialized appointments, such as ATF Task Force Officers. (Lancaster Dep. 86:2-3; 88:13-21; Ruszkowski Dep. 38:19-39:15). Non-patrol assignments that are subject to term limits include the Detective Bureau, Training Division, as well as satellite units like the ATF Task Force Officers, the Special Victims' Unit, the Metro Homicide Unit (before it was disbanded), the Drug Investigation Unit (before it was disbanded), the Strategic Focus Unit, and School Resource Officers. (Lancaster Dep. 92:8-15, 19-24; Biggs Dep. 37:2-9; Ruszkowski Dep. 53:3-16, 88:18-89:10).

102.    The term limit changes were communicated through the Department's job postings and job descriptions. (Ruszkowski Dep. 39:18-40:1). When an officer completes a term, the position is posted so that all officers, including the incumbent, are allowed to apply for the position. (Lancaster Dep. 87:12-20, 21-24; Biggs Dep. 28:21-29:8).

103.    The ATF Task Force Officers (who were Scott and Bayne Bennett) were initially allowed to stay in their positions, without reapplying, for longer than intended because the Department overlooked instituting the limit on those positions. (Ruszkowski Dep. 41:16-42:20; 57:23-58:5; 66:5-9).  The Fraternal Order of Police brought the lack of term limits on ATF Task Force Officer assignments to the attention of Chief Ruszkowski and then Scott and the other ATF Task Force Officer (Bayne Bennett) were informed that the Department had missed them being involved in the term limit process.  (Ruszkowski Dep. 41:16-43:15).

104.    Scott testified that he does not have any reason to believe the ATF Task Force Officer positions were opened up to applicants for a reason other than to institute term limits. (Scott Dep. 61:14-20; 61:25-62:11; 63:7-20; 64:1-4; 64:13-18). Scott did not ask Ruszkowski why the positions were opened. (Scott Dep. 76:17-20; 160:21-170:6). Nor did Scott ask his

24

direct supervisor at the time, Bert Wise, why they were opened. (Scott Dep. 77:6-15).

105.  Around this time, ATF Special Agent Lerch took over for a retired ATF agent and thereafter met with Ruszkowski; during their conversation, Lerch advised Ruszkowski he wanted to make personnel changes on the ATF Task Force. (Ruszkowski Dep. 50:21-52:12; 59:13-60:19). No specific Task Force Officer was mentioned and they did not discuss the replacement of any personnel. (Ruszkowski Dep. 51:22-23, 52:9-12). However, they did discuss term limits and how the process works. (Ruszkowski Dep. 52:9-18).

106.  The ATF Task Force Officers were brought into the term limit program but were given additional time in the position before reapplying. (Ruszkowski Dep. 42:21-43:15; 86:7-21). Lancaster and Biggs informed Lerch of the ATF that the Task Force Officers will have to reapply for their position with ATF every four years. (Biggs Dep. 37:13-20; 39:9-22). Lancaster and Biggs wanted to ensure that the ATF had 90 days to update their internal processes. (Biggs Dep. 40:6-12). For outside appointments, like Task Force Officers, the federal agency makes the selections. Other than posting the position, the Department had no involvement in the selection of Task Force Officers. (Lancaster Dep. 91:2-6).

107.  Later in 2020, the ATF Task Force Officer positions were posted throughout the entire Department, and that posting explained the term limits – i.e., that the position would continue for a maximum of four years without the need to reapply. (Lancaster Dep. 89:16-17; Ruszkowski Dep. 39:21-40:17; Scott Dep. Ex. F; Scott Dep. 103:7-13).

108.  Scott applied for the ATF Task Force Officer position. (Scott Dep. 102:17-25; 107:21-25; Scott Dep. Ex. G). Scott and the other Task Force Officer (Bayne Bennett, who did not join the Tapes Case), were informed in a meeting with Bert Wise, Biggs, and Lancaster

that they would not be required to interview for the ATF Task Force Officer positions unless they wanted to, and they would be treated as a finalist to the position. (Biggs Dep. 34:5-11; Scott Dep. 83:15-84:6; 92:25-94:12; 98:4-7; 102:1-3) Both Scott and Bennett declined to interview. (Lancaster Dep. 89:17-21; Scott Dep. 101:21-25).

109.    Kyle Lerch, in consultation with other ATF Agents Brenden Iber and Sean Skender, selected Officers Bayne Bennett and Brandon Stec for the Task Force Officer positions. (Lerch Dep. 32:14-34:16). None of the South Bend Defendants participated in this decision. *Id.*

110.    After the interviews, Lancaster was notified by ATF that ATF had selected Bayne Bennett and Brandon Stec to be Task Force Officers. (Lancaster Dep. 89:23-90:1; 90:20). Biggs notified all candidates of the ATF's selections. (Biggs Dep. 42:12-14).

111.    The South Bend Police Department was not part of the selection process or privy to ATF's selection process. (Biggs Dep. 36:4-12; 42:1-8; Ruszkowski Dep. 61:8-25). Ruszkowski was not consulted in ATF's decision and did not offer any input. (Ruszkowski Dep. 61:8-25). Ruszkowski was surprised that ATF did not opt to retain Scott as a Task Force Officer. (Ruszkowski Dep. 87:5-13). Similarly, Lancaster was not involved in ATF's decision to select someone other than Scott. (Lancaster Dep. 84:15-24). The ATF did not inform Lancaster of the reason for the selection and he did not inquire about it. (Lancaster Dep. 90:21-25).

112.    Scott does not know who selected the ATF Task Force Officers. (Scott Dep. 108:12-16). Scott has no evidence to suggest, or any reason to believe, that the City or the named Defendants were involved in the selection of ATF Task Force Officers other than his own conjecture that the "entire chain of command" must have had to approve the decision.

(Scott Dep. 80:4-83:6; 97:2-25; 171:19-172:14). Specifically, Biggs is part of the "chain of command." (Scott Dep. 172:7). Lancaster is part of the "chain of command." (Scott Dep. 173:3-7). The City "through their policies and procedures allowed things to occur." (Scott Dep. 176:6-9). Scott also asserts that Ruszkowski and Miller, along with Biggs and Lancaster, allowed Scott to be removed – though he has "no clue" whether they had a duty to prevent it. (Scott Dep. 178:2-7; 188:24-189:7; 189:14-16).

113.    While Scott was not retained as a Task Force Officer and returned to patrol (the midnight shift, at his request) his other assignments continued, including his service on the Department's SWAT Team, firearms training team, and explosives ordinance team. (Scott Dep. 17:12-16; 20:9-20; 116:5-17). Scott kept his rank of patrolman. (166:19-21; 17:12-20).

114.    Despite losing the overtime potential of the ATF position, Scott continued to receive six hours of extra pay for sniper practice and explosive entry training. (Scott Dep. 22:2-7; 116:1-16). Scott started to receive extra pay for sniper practice in 2008. He used to receive 12 hours, but it was cut to six when Ruszkowski took over as Chief in 2015, before Scott joined the Tapes Case. (Scott Dep. 22:13-20; 22:18-20).

115.    Scott also continued to occasionally work overtime as a training officer. (Scott Dep. 26:21-27:20). Depending on his schedule, he would continue to earn anywhere between 6-36 hours of overtime per training session. (Scott Dep. 28:4-12). Training decreased during the COVID-19 pandemic. (Scott Dep. 29:5-10).

116.    Scott remained on midnight patrol until April 25, 2023, when Scott retired from the Department. (Ruszkowski Aff., ¶16).  During his deposition, he noted that he "want[ed] to complete [his] 20 years in South Bend and move on." (Scott Dep. 195:21-22).

FAEGRE DRINKER BIDDLE & REATH LLP

/s/ Angela N. Johnson
Angela K. Hall (#26991-71)
Angela N. Johnson (#32025-71)
FAEGRE DRINKER BIDDLE & REATH LLP
300 North Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: (317) 237-0300
Facsimile: (317) 237-1000
Email:   angela.hall@faegredrinker.com
         angela.johnson@faegredrinker.com

*Attorney for Defendants City of South Bend,
Scott A. Ruszkowski, Individually and in his
Official Capacity as Chief of Police, Timothy
Lancaster, Jason Biggs, and Kayla Miller*

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2023, a copy of the foregoing was filed electronically.

Service of this filing will be made on all ECF-registered counsel by operation of the Court's

electronic filing system. Parties may access this filing through the Court's system.

Jeffrey S. McQuary
TOMPKINS LAW
608 E. Market St.
Indianapolis, IN 46202
317-631-6866
317-685-2329 (fax)
jmcquary@tlawindy.com

Daniel H. Pfeifer
PFEIFER MORGAN & STESIAK
53600 N. Ironwood Drive
South Bend, IN 46635
574-272-2870
574-271-4329 (fax)
dpfeifer@pilawyers.com

*Counsel for Plaintiffs*

J. Taylor Kirklin
Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048
317-226-6333
317-226-6125 (fax)
taylor.kirklin@usdoj.gov

*Attorney for Defendant Merrick Garland
Acting Under Authority Conferred by 28
U.S.C. § 515*

/s/ Angela N. Johnson

28