| | | |
|---|---|---|
| SHELDON SCOTT and JAMES TAYLOR, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-00223-DRL-MGG |
| | ) | |
| CITY OF SOUTH BEND, SCOTT A. | ) | |
| RUSZKOWSKI, Individually and in his | ) | |
| Official Capacity as Chief of Police, | ) | |
| TIMOTHY LANCASTER, | ) | |
| JASON BIGGS, KAYLA MILLER, and | ) | |
| MERRICK GARLAND, | ) | |
| in his official capacity | ) | |
| as the U.S. Attorney General, | ) | |
| | ) | |
| Defendants. | ) | |

## SOUTH BEND DEFENDANTS' MEMORANDUM IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants City of South Bend, Scott A. Ruszkowski, Timothy Lancaster, Jason Biggs, and Kayla Miller (collectively, the "South Bend Defendants"), respectfully submit this Memorandum in Support of Their Motion for Summary Judgment. Pursuant to N.D. Ind. L.R. 56-1(a), the South Bend Defendants have filed their Statement of Material Facts ("Facts") contemporaneously herewith.

## I.     INTRODUCTION

Plaintiffs complain that the South Bend Defendants violated their First Amendment rights by retaliating against them after they intervened in another lawsuit. That lawsuit concerned the recording of private conversations on phone lines at the South Bend Police Department (the "Tapes

Case").[1] To support their claim, Plaintiffs point to conduct that took place years after their intervention and that have no causal connection to their involvement in the Tapes Case.

Specifically, Taylor alleges he was subjected to unwarranted discipline by the South Bend Defendants, and that investigations of Taylor's conduct were approved by Chief Ruszkowski, in retaliation for Taylor's participation in the Tapes Case. (Am. Compl., Dkt. 25 at ¶¶ 22, 25, 35). Taylor also alleges that Chief Ruszkowski removed Taylor as a Task Force Officer deputized to the U.S. Bureau of Alcohol, Tobacco, and Firearms ("ATF"). (Am. Compl. at ¶ 23). Scott alleges Chief Ruszkowski opened up his position as an ATF Task Force Officer in retaliation for his participation in the Tapes Case. (Am. Compl. at ¶¶ 28, 36). However, all of these actions were taken for legitimate, non-retaliatory reasons that have nothing to do with Plaintiffs' involvement in the Tapes Case.

Plaintiffs' claims should be dismissed on summary judgment because they cannot establish a prima facie case of First Amendment retaliation, cannot prove that the South Bend Defendants would have acted in a different manner had Plaintiffs not joined the Tapes Case, and cannot prove that the South Bend Defendants' explanation for the alleged retaliatory actions were merely pretext for retaliation. Moreover, even if the Court finds a violation, Ruszkowski, Biggs, Lancaster, and Miller are entitled to qualified immunity and should be dismissed on those grounds. Accordingly, dismissal of the Plaintiffs' claims against all of the South Bend Defendants is proper.

## II. LEGAL STANDARD

Summary judgment under Fed. R. Civ. P. 56 is mandated where there are no disputed issues

---

[1] On September 14, 2012, the South Bend Common Council filed the Tapes Case against the South Bend City Administration to compel the release of recorded telephone conversations at the South Bend Police Department. (Facts ¶ 15). On February 20, 2018, Taylor, Scott, and another individual (Scott Hanley) joined the existing Tapes Case to stop the release of their own recorded conversations. (Facts ¶ 16).

of material fact and the movant must prevail as a matter of law. *Demmpsey v. Atchison, Topeka, and Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994); Fed. R. Civ. P. 56(a). It is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010); *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). If the non-moving party does not establish an element essential to his case, summary judgment must be granted for the moving party. *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996). Summary judgment is not a disfavored procedural shortcut but rather, it is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 327 (1986). Only those facts which might affect the outcome of the suit in light of substantive law are material facts sufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Ultimately, the court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

## III.  ARGUMENT

To succeed with their First Amendment retaliation claims, Plaintiffs must first establish a prima facie case by presenting evidence that (1) their speech was constitutionally protected, (2) they suffered a deprivation likely to deter free speech, and (3) their speech was at least a motivating factor of the Defendant's actions. *Sweet v. Town of Bargersville*, 18 F.4th 273, 278 (7th Cir. 2021) (citing *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 670 (7th Cir. 2009)). If Plaintiffs meet their burden, only then would the burden shift to the Defendants to demonstrate they would have taken the same actions regardless of the protected speech. *Id*. Finally, the burden shifts back to the

Plaintiffs to produce evidence that the employer's proffered reason for the actions were merely pretextual. *Id. See also Williams-Preston v. S. Bend Cmty. Sch. Corp.*, No. 3:20-CV-773 JD, 2023 WL 2074351, at *3 (N.D. Ind. Feb. 17, 2023). Here, Plaintiffs are unable to carry their burden in establishing a prima face case or presenting evidence of pretext. Therefore, summary judgment on Plaintiffs' claims is warranted as a matter of law.

A.  **Plaintiffs Cannot Establish a Prima Facie Case of First Amendment Retaliation**

1.  **Plaintiffs Did Not Engage in Speech Protected Under the First Amendment**

Scott and Taylor's claims cannot survive summary judgment because their intervention in the Tapes Case does not constitute speech protected by the First Amendment. Whether a public employee's speech was constitutionally protected is a question of law for the Court. *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999). To constitute protected speech, the employee must establish all of the following: "(1) they made the speech as a private citizen, (2) their speech addressed a matter of public concern, and (3) their interest in expressing that speech was not outweighed by the state's interests as an employer in 'promoting effective and efficient public service.'" *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (quoting *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008)). Plaintiffs cannot meet this standard because their intervention in the Tapes Case does not address a matter of public concern.

Whether a government employee's speech addresses a matter of public concern depends upon "the content, form, and context of [the speech] as revealed by the whole record." *Gustafson v. Jones*, 290 F.3d 895, 906–07 (7th Cir. 2002) (citing *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)). Of these factors, content is most important. *Button v. Kibby–Brown*, 146 F.3d 526, 529 (7th Cir. 1998); *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994); *Belk v. Town of Minocqua*, 858 F.2d 1258, 1264 (7th Cir. 1988). The "public concern" element is

4

satisfied if the speech relates to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee. *Connick*, 461 U.S. at 146. As the Eleventh Circuit observed, "[a] public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007) (quoting *Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir. 1986)).

For instance, a lawsuit brought by public officials challenging a law to reform the workers' compensation system that effectively ended their positions was found not to constitute protected speech in their subsequent First Amendment retaliation case, despite media reports that generated public interest in the contested law and the lawsuit. *See Hagan v. Quinn*, 84 F. Supp. 3d 826, 828 (C.D. Ill. 2015), *aff'd on other grounds*, 867 F.3d 816 (7th Cir. 2017)*. As the court noted:

> While the underlying lawsuit may have engendered some public interest about the worker's compensation system, that does not change the character of Plaintiffs' underlying lawsuit. Nor does Plaintiffs' alleged motivation to publicly air worker compensation issues change the character of the underlying lawsuit. Plaintiffs' *expression* of their concern was purely personal – to protect their jobs and reputations.

*Id.* at 831 (citing *Bivens v. Trent,* 591 F.3d 555, 561 (7th Cir. 2010) ("if the speech concerns a subject of public interest, but the *expression* addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern.") (italics in original). The *Bivens* suit made no reference to public concerns or public benefit, nor were any evident. *Id.* at 831. Instead, the plaintiffs merely alleged the law was unconstitutional because it might deprive them personally of their jobs without procedural due process. Importantly, the court found that neither the "marketplace of ideas" nor the "vitality of public debate" would be affected by concluding the underlying suit was not protected speech. *Hagan,* 84 F. Supp. at 831.

Additionally, a police officer's lawsuit alleging that the city retaliated against him for writing an official report about the treatment of public employees and health concerns at his precinct, was not a matter of public concern, and thus was not protected by the First Amendment. Instead, that suit was to redress his personal grievances and sought relief for himself alone. *Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir. 2008).

Here, by their own admission through their filings in the Tapes Case, the Plaintiffs' motivation for joining that lawsuit was specifically to address a matter of private concern, avoid public controversy by stopping the release of their recorded conversations, and redress their personal grievances. (Facts ¶¶ 16-18). Specifically, Plaintiffs became involved in the lawsuit because they claim[ed] "a **privacy interest** in the tapes and/or digital recordings, which allegedly contain recordings of [their] **private** phone conversations with South Bend Officer Brian Young, which were recorded without [their] consent." (Facts ¶ 17, emphasis added). Plaintiffs intervened in the Tapes Case because the interest of the existing parties did not adequately represent Plaintiffs' personal interests in the tapes. (Facts ¶ 18). Furthermore, Scott testified that he felt it was inappropriate that others would get to "listen to [his] wife and [him] talk." (Facts ¶ 17).

Like the plaintiffs in *Hagan*, Scott and Taylor participated in the Tapes Case – a case which had garnered public interest – to address a matter of private concern, namely recordings of their private conversations, which they hoped to keep confidential. While it may be argued that that the Tapes Case itself touches on a matter of public concern, Scott and Taylor joined the case to address their own personal grievances and keep their private conversations private. They did not seek redress for anyone other than themselves. Certainly, Taylor and Scott's desire to keep their personal conversations private did not affect the "marketplace of ideas" nor the "vitality of public debate." *Hagan* at 831. Furthermore, Scott and Taylor made even less of an attempt to address a

matter of public concern than the plaintiff in *Ruotolo*, who at least by filing a report of health concerns at his precinct was addressing a personal grievance with the potential to affect others – and even then, the Court ruled the plaintiff was still not speaking on a matter of public concern. For this first reason alone, Plaintiffs cannot establish a prima facie case of First Amendment Retaliation and their claims should be dismissed.

### 2. Plaintiffs' Alleged Deprivations Did Not Deter their Speech

A First Amendment retaliation claim does not require an adverse employment action within the same meaning as other anti-discrimination statutes. *Rager v. Dukes,* 2021 WL 6125124 (N.D. Ind. 2021) (citing *Power v. Summers,* 226 F.3d 815, 820 (7th Cir. 2000)). The Seventh Circuit has explained that "adverse employment action" in the § 1983 context must be sufficiently adverse to deter the exercise of the individual's right to free speech. *Power,* 226 F.3d at 820-21. Even assuming *arguendo* that Plaintiffs' intervention in the Tapes Case constitutes protected speech, no actions taken by the South Bend Defendants deterred Plaintiffs' right to exercise that (hypothetically protected) speech. To the contrary, each has remained a party to the Tapes Case since they joined on February 20, 2018. (Facts ¶ 16).

Nevertheless, while the bar to show deprivation is low, Taylor implausibly asserts that every discipline and investigation initiated by the South Bend Defendants[2] concerning his policy violations and performance occurred because he intervened in the Tapes Case – namely:

- On February 13, 2020, Biggs and Miller wrote up Taylor for multiple issues pertaining to Taylor's deficient reports, including missing pages, failing to document an arrest, failing to submit interview notes, and failing to complete reports in a timely manner.

---

[2] The first and second disciplines issued to Taylor after he joined the Tapes Case were issued by Sergeant Elwaer on January 11, 2019 and April 15, 2019 – approximately one year after Taylor joined that litigation. (Facts ¶¶ 41-42). Yet, Taylor does not allege any actions taken by Elwaer were retaliatory.

(Facts ¶ 50). This occurred after Taylor had already been coached and warned about similar performance problems. (Facts ¶¶ 30, 40-42, 49-50)

- On March 18, 2020, Biggs issued Taylor a written discipline after he failed to submit a supplemental report detailing his actions in a vehicle pursuit while in his unmarked detective vehicle; Taylor failed to file the report despite being asked to do so over a period of months. (Facts ¶ 51). This led to an Administrative Advisory sent to Internal Affairs. (*Id.*)

- On March 23, 2020, Biggs submitted an Administrative Advisory after Taylor executed a drug arrest but failed to file the required arrest report before the end of his shift, in violation of Department policy. (Facts ¶ 56). The Administrative Advisory also outlined Taylor's ongoing issues with report writing despite prior coaching.

- On March 26, 2020, after Taylor failed to secure a crime scene before leaving to obtain a search warrant, Miller submitted another Administrative Advisory. (Facts ¶ 57). When Taylor arrived on the scene, he asked the suspect for a weapon used in the crime and when the suspect refused, Taylor told the suspect that he would return with a search warrant. Once Taylor returned to the suspect, the evidence was gone. Department policy, which Taylor violated, requires an officer to call in backup to secure the scene before leaving to secure a warrant. Taylor also failed to complete a supplemental report documenting the damage to the property that had occurred after he left. (*Id.*)

- As a result of Taylor's conduct, he was investigated by Internal Affairs. During the review, Biggs was directed to complete an investigation where he collected facts and supporting documentation related to three Administrative Advisories that had been filed concerning Taylor, and Taylor's series of performance concerns and progressive

disciplines, as well as Taylor's recent false arrest. (Facts ¶ 58). Taylor's violations were sustained. (*Id.*)

- Following the Internal Affairs investigation, Taylor was placed on a performance improvement plan ("PIP") and suspended for one day without pay. (Facts ¶¶ 65-66). As a part of the PIP, Taylor was expected to remain at the station to review case files, not work overtime or outside employment, and meet daily with Miller and weekly with Biggs. (Facts ¶¶ 69, 74-75).

- During the PIP, on July 8, 2020, Taylor disregarded a direct order by Miller when he contacted an outside police agency within 30 minutes after Miller instructed him not to do so. (Facts ¶ 80). Biggs directed Miller to complete a shift-level advisory related to Taylor's insubordination, which was turned over to Internal Affairs. (Facts ¶ 81).

Taylor also alleges that Ruszkowski removed Taylor's special deputy credentials with the ATF; however, those credentials were provided solely by ATF and ATF agents alone allowed the credentials to expire in 2020. (Facts ¶ 79).

Even if Taylor's cobbled-together speculations are sufficient to establish a constitutional deprivation, for the reasons explained below, every action taken was legitimate and would have occurred regardless of Taylor's involvement in the Tapes Case, rendering summary dismissal of Taylor's claims appropriate. Moreover, Taylor does not point to any adverse action taken against him by the City; instead, he merely claims the City failed to protect his rights as an employee. (Facts ¶ 20). Accordingly, Taylor's claims against the City should further be dismissed, as it is well-established that the doctrine of *respondeat superior* does not apply to constitutional deprivation claims brought under 42 U.S.C. § 1983. *See Bostic v. Vasquez*, No. 2:15-CV-429-JPK, 2023 WL 356841 (N.D. Ind. Jan. 23, 2023).

As to Scott's claims, he cannot point to any sufficient adverse action taken by the South Bend Defendants to stifle his free speech. In *Rager v. Dukes*, No. 3:20-CV-43 JD, 2021 WL 6125124, at *5 (N.D. Ind. Dec. 28, 2021), this Court held that a sheriff's act of reassigning the plaintiff from detective to patrol, after deciding to open positions to all merit deputies by implementing a new interview and selection process, was not sufficiently adverse. The Court noted that the sheriff did not decrease plaintiff's pay or benefits and did not diminish his responsibilities, especially because he maintained the same rank. *Id.*

Similarly, Scott claims he was retaliated against when the City and Chief Ruszkowski instituted term limits[3] and allowed other officers to apply for his position as an ATF Task Force Officer. (Facts ¶ 91). Although ATF selected a different officer in place of Scott – importantly, the South Bend Defendants did not make that decision. (Facts ¶¶ 109-111). Like *Rager,* Scott was transferred back to patrol (Facts ¶ 113), and Scott kept his rank and other assignments including on the SWAT Team, Firearms Training, and Explosives. (Facts ¶¶ 113-115). Therefore, Scott's claims against the South Bend Defendants should be dismissed, even on this point alone.

### 3. Speech Was Not a Motivating Factor of the South Bend Defendants' Actions

The calculation of a motivating factor "amounts to a causation inquiry" requiring the Plaintiffs to "show that [their] protected conduct was a substantial or motivating factor in the employer's decision." *Massey v. Johnson*, 457 F.3d 711, 716–17 (7th Cir. 2006). Neither Scott nor Taylor have produced in this case any direct evidence of any South Bend Defendants' purported retaliatory animus. Accordingly, their claims depend upon circumstantial proof, "such as the timing of events or the disparate treatment of similar individuals" to do so. *Massey*, 457

---

[3] "Term limits" refers to how long an officer can serve in a special assignment before it is necessary to reapply for the role. (Facts ¶ 100). When an officer completes a term, the position is posted so that all officers, including the incumbent, are allowed to apply for the position. (Facts ¶ 102)

F.3d at 717; *Kingman v. Frederickson*, 40 F.4th 597, 601 (7th Cir. 2022).

a.     Neither Plaintiff Can Point to Sufficiently Close Timing

The timing between protected speech and adverse action must be "very close,"—as in "no more than a few days." *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 572 (7th Cir. 2021) (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)). Timing will "rarely be sufficient in and of itself to create a triable issue." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)).

In *Kingman*, three months separated the plaintiff's public criticism of another employee and his termination. *Kingman v. Frederickson*, 40 F.4th 597, 603 (7th Cir. 2022). The plaintiff argued that an escalating pattern of snubs, hostility, and maneuvering to push him out the door bridged that temporal gap and demonstrated that his June 2019 firing was still causally related to his March 2019 speech. *Id.* The Seventh Circuit noted that Plaintiff's argument was akin to another the court found unconvincing in *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (concluding that five post-speech incidents, the first happening two months after the alleged protected speech, leading up to his termination did "not give rise to an inference that [the plaintiff's] speech was a motivating factor in any of the employment actions taken against him").

In *Rager v. Duke*, this Court held that discipline issued approximately one month after, and a suspension taken more than four months after the fact, was not sufficiently "close on the heels" of protected speech. 2021 WL 6125124 (N.D. Ind. 2021) (citing *FKFJ, Inc. v. Vill. of Worth*, 11. F.4th 574, 587 ("A delay of two or three months between the protected activity and adverse action is far from sufficient to raise an inference of retaliation"). Furthermore, in *Sweet v. Town of Bargersville*, the Seventh Circuit found a time lapse of five months between the speech and firing is simply too great to support an inference of retaliatory motive and that, though there is "no set

11

legal rule [,]…we typically allow no more than a few days to elapse between the protected activity and the adverse action." 18 F.4th 273, 279 (7th Cir. 2021).

Here, the Plaintiffs' alleged protected speech occurred when they joined the Tapes Case on February 20, 2018. Taylor was not disciplined by any of the South Bend Defendants until nearly two years later. (Facts ¶ 50). Scott's assignment with ATF was not subject to term limits until 18 months later, and his assignment with ATF continued until more than two years after he joined the Tapes Case. (Facts ¶¶ 106-110). These time gaps are vastly longer than the three-month and five-month differences found too attenuated in *Kingman* and *Sweet*, respectively. The issuance of the PIP to Taylor on May 6, 2020 – more than two years after Taylor joined the Tapes Case – is even more attenuated. (Facts ¶ 65). As noted above, Courts require much closer timing to show the protected speech was a motivating factor in any adverse action.

Even when the South Bend Defendants could have taken adverse action against Plaintiffs much closer in time to Plaintiffs' intervention in the Tapes Case, they did not do so. Two months after Taylor joined the Tapes Case, Biggs completed Taylor's performance review, which was generally favorable despite his ongoing issues with report writing. (Facts ¶ 29). Biggs did not want to "mark-up" Taylor's record and wanted to be sensitive to Taylor's personal issues outside of work. (*Id.*) Scott's performance evaluation was completed by Biggs two months after Scott joined the Tapes Case, and Biggs evaluated Scott more favorably than Scott rated himself. (Facts ¶ 92).

Lancaster became Division Chief four months after Plaintiffs intervened in the Tapes Case and soon after learned of Taylor's failures to timely submit and include pertinent details in reports, for which Lancaster could have issued discipline, but instead, Captain Bontrager sent informal coaching emails to Taylor. (Facts ¶ 30). Similarly, Biggs could have disciplined Taylor for his profane language but instead counseled him. (Facts ¶ 41). Miller and Biggs also coached Taylor

about his report writing in 2019, before they had to resort finally to formal discipline in 2020. (Facts ¶¶ 40, 53-54).

Ruszkowski learned in 2019 that, many months prior, Scott punched a deputy prosecutor in the head at a bar after returning from a warrant call. (Facts ¶ 94). Scott's conduct violated multiple Department policies and he failed to report it to the Department. (Facts ¶¶ 94-96). Ruszkowski could have issued discipline but, like the other Defendants, he refrained. (Facts ¶ 96).

### b. Neither Plaintiff Can Point to Disparate Treatment of Others

Plaintiffs cannot identify any similarly situated officer treated more favorably than they were under similar circumstances. Taylor was given significantly more opportunities through informal coaching to self-correct and rehabilitate, as compared to other officers who exhibited similar performance problems, before his supervisors were left with no choice but to resort to discipline, and eventually, the PIP. Other detectives have been removed from the Bureau for issues related to reports, whereas Taylor was coached repeatedly before discipline and he was never reassigned out of the Bureau. (Facts ¶ 36). Taylor was not disciplined for profane language, but other officers have been suspended. (Facts ¶ 43). As another example, an officer was placed on a performance improvement plan after she committed pursuit policy violations on March 13 and 29, 2022, when she operated her Department vehicle outside of approved standards. (Facts ¶ 89). A subsequent violation resulted in a six-day unpaid suspension, mandatory training, and ineligibility for promotion for six months. (Facts ¶ 90). The officer was put on a PIP after two violations of Department policy over a month period and then suspended for six days. Taylor, by comparison, was given *years* to correct his behavior before being subject to a PIP and receiving a one-day unpaid suspension.

Scott alleges the City and Ruszkowski retaliated against him by opening up his ATF Task

Force Officer position to other applicants, but conveniently ignores the fact that every other non-patrol officer assignment became subject to term limits beginning in 2016. (Facts ¶¶ 100-101). The institution of term limits to specialty assignments affected many officers – Scott was not singled out, though he was given more time to stay in his position without reapplying simply because the Department overlooked instituting the limit to the two ATF Task Force Officer assignments. (Facts ¶¶ 101, 103). When the two Task Force Officer assignments became subject to term limits, all officers – including Scott – were allowed to apply for the position. (Facts ¶¶ 106-108). Scott was treated more favorably than other candidates because he was not required to interview and was guaranteed a spot as a finalist if he desired, a benefit he took advantage of. (Facts ¶ 108). Further, Scott's assignment with ATF was not the only one affected by the application of term limits to the Task Force Officer positions. Bayne Bennett, the other Task Force Officer, was also required to reapply to retain the assignment. (*Id.*). The fact that ATF decided to retain Bennett, but replace Scott, was not within the South Bend Defendants' control. (Facts ¶¶ 109-111). None of them provided input or influenced in any way ATF's decision to select another officer over Scott. (*Id.*) Scott can hardly claim disparate treatment – he was treated by the City and Ruszkowski in the same manner, or better, as all other officers subject to term limits.

Simply put, neither Plaintiff can establish any causal link between their involvement in the Tapes Case and any subsequent adverse action taken against them. Accordingly, Plaintiffs' claims against the South Bend Defendants should be dismissed.

**B.** **The South Bend Defendants Acted for Legitimate, Non-Retaliatory Reasons and Would Have Acted in the Same Manner Regardless of the Tapes Case**

As noted by the Seventh Circuit, if a prima facie case were established, "the burden [would then] shift[ ] to the defendant[s] to show that the harm would have occurred anyway." *Hawkins v.*

*Mitchell*, 756 F.3d 983, 996 n.10 (7th Cir. 2014) (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 251-52 (7th Cir. 2012)). Here, even if Plaintiffs could establish a prima facie case of First Amendment retaliation, which they cannot, their claims should still be dismissed because the South Bend Defendants had legitimate, non-retaliatory reasons for their actions and would have acted in the same manner regardless of Plaintiffs' intervention in the Tapes Case.

### 1. The Legitimate, Non-Retaliatory Reasons for Disciplining Taylor

Although Taylor asserts he was disciplined because of his involvement in the Tapes Case, Taylor was written up five times before he joined the case, for various issues including multiple traffic accidents and an Internal Affairs investigation into a policy violation for making personal purchases while on duty. (Facts ¶¶ 21-26). Additionally, Taylor's issues with report writing pre-date his involvement in the Tapes Case and his superiors attempted to coach him, but his performance had not improved. (Facts ¶ 25, 27, 30). After Taylor intervened in the Tapes Case, he received additional coaching and written discipline from Captain Bontrager and Sergeants Elwaer and Rohrscheib,[4] in effort to correct Taylor's performance issues. (Facts ¶¶ 30, 41-42, 44).

Despite many emails and coaching sessions by multiple superiors (including Biggs and Miller) in effort to help Taylor improve his performance and follow Department policy, Taylor's conduct worsened. (Facts ¶¶ 40-42, 48-49, 53). In addition to persistent issues related to reports, Taylor's violations escalated, becoming more egregious in late 2019 and 2020. (Facts ¶¶ 43-45, 48, 50-52, 56-59). He failed to document an arrest and failed to submit notes of a witness interview. (Facts ¶¶ 50, 56). He violated Department policy when engaging in a vehicle pursuit and then failed to submit the required supplemental report after multiple months despite being

---

[4] Yet, Taylor did not name them as Defendants and does not allege these disciplines were retaliatory.

specifically instructed to do so. (Facts ¶ 51). Taylor failed to secure a crime scene before leaving to obtain a search warrant. (Facts ¶ 57). He left an arrested person in jail for at least 24 hours after learning the person was unlikely the suspect, and after he arrested another suspect for the same crime the next day. (Facts ¶ 59). Taylor also had an unusually high number of "No Victim Cooperation" cases; he had between 130 to 140 such cases, whereas other detectives only 20 to 30. (Facts ¶¶ 37-38). Taylor's superiors wanted to help him succeed and they had been lenient with Taylor due to his personal issues. (Facts ¶ 29, 47-51, 53-54). These actions are the opposite of retaliatory animus. Ultimately, Biggs, Lancaster, and Miller could no longer ignore Taylor's misconduct and performance problems. (*Id.*) Taylor does not dispute that he violated Department policies and failed to timely submit reports. (Facts ¶¶ 61-62). These were serious issues that required corrective action regardless of Taylor joining the Tapes Case two years prior.

Ruszkowski became concerned by Taylor's repeated violations and performance problems, which persisted despite his superiors' efforts to help him improve. (Facts ¶¶ 62). Taylor did not dispute the concerns about his performance and took responsibility for some of his mistakes. (Facts ¶ 62). He also disclosed he was having "home life issues" and "personal issues," as well as memory loss that were interfering with his performance. (Facts ¶¶ 62-64). Since Taylor's behavior had not improved – and was even escalating – despite past coaching and disciplinary actions, Ruszkowski opted to implement a PIP on May 6, 2020, to help Taylor save his employment, instead of end it. (Facts ¶ 65). Due to the Internal Affairs investigation and conclusion of multiple violations, Taylor was also suspended one-day without pay. (Facts ¶ 66).

As part of the PIP, Biggs reviewed policies with Taylor (including those he had violated), and Taylor was expected to remain at the Detective Bureau to focus on reviewing and progressing through his 130 or more No Victim Cooperation cases which dated back to 2016. (Facts ¶¶ 68-

69). Taylor could leave the station to follow up on these cases or to deal with personal issues. (Facts ¶¶ 69-70). However, Ruszkowski and others had concerns about Taylor leaving the station given his recent serious policy violations and Taylor's report of memory loss. (Facts ¶¶ 71-72). Taylor being required to stay at the station was not unusual. Other officers with serious performance issues have been restricted to the station and required to work on correcting the issues before the officer is again allowed to interact with the public, make arrests, or take away citizens' freedoms. (Facts ¶ 73).

Taylor was also expected to meet daily with Miller, and weekly with Biggs, to ensure his successful completion of the PIP requirements. (Facts ¶ 75). It was not always possible for the daily meetings to occur, and if they did not, it did not hinder or delay Taylor's completion of the PIP requirements. (Facts ¶ 77). Taylor was restricted from engaging in outside employment or overtime, so that he could focus on completing the requirements of his PIP, perform his current assigned tasks satisfactorily, and avoid becoming overwhelmed or distracted. (Facts ¶ 74).

Taylor accepted the requirements of the PIP and his one-day suspension. (Facts ¶ 76). These actions were taken for legitimate, non-retaliatory reasons due to concerns about Taylor's performance. The South Bend Defendants needed to ensure the quality of Taylor's work because a complete and timely report is required before a suspect can be charged with a crime. (Facts ¶¶ 32-33). Violent suspects can continue to be a threat to the community unless reports are completed quickly, and the prosecutor's office has all of the information it needs to bring charges. (*Id.*) Taylor's report deficiencies also had to be addressed because the Department's policies require that an officer be disciplined for the submission of late reports. (Facts ¶ 35). Again, other officers have been removed from the Detective Bureau for report issues. (Facts ¶ 36). And, Taylor's violations of the vehicle pursuit policy jeopardized the safety of officers and the community. (Facts

¶¶ 51-52). The high number of No Victim Cooperation cases was a red flag and could suggest either Taylor was not effective when speaking with victims or did not speak to them at all. (Facts ¶¶ 37-38). It was ultimately discovered that some of the victims in Taylor's cases were willing to cooperate. (Facts ¶ 78). Written discipline, including PIPs, are included in the Department's Discipline Matrix as one option to correct an officer's behavior and considered to be a regular part of the South Bend Police Department's performance improvement process. (Facts ¶ 67).

During the PIP, Taylor disregarded a direct order by Miller when he contacted an outside police agency in a missing persons case that was assigned to another detective, within 30 minutes after Miller told Taylor not to do so. (Facts ¶ 80). Miller gave the directive because she wanted to assist the detective establish contact with the agency for this and future missing persons, since the detective was assigned a large majority of such cases. (*Id*.) Biggs directed Miller to complete an Administrative Advisory for Taylor's insubordination, which was turned over to Internal Affairs and investigated. (Facts ¶ 81). Taylor's insubordinate conduct, and failure to timely submit a report for his activity in the case, were sustained. (Facts ¶ 81). Following this violation, Human Resources recommended Taylor be placed on light duty status until a fit for duty evaluation could be completed. (Facts ¶¶ 82-84). Taylor was subsequently released from all restrictions and successfully completed the PIP on September 28, 2020. (Facts ¶ 85). His employment continued until he voluntarily retired on August 2, 2021. (Facts ¶ 6).

In *Rager v. Dukes*, No. 3:20-CV-43 JD, 2021 WL 6125124, at *8-9 (N.D. Ind. Dec. 28, 2021), the plaintiff, like Taylor, submitted reports untimely and violated department policy during a vehicle pursuit. As with *Rager,* Taylor does not dispute that he did in fact violate Department policies and failed to timely submit reports. (Facts ¶¶ 61-62). However, Taylor asserts, without support, that he was the only one to be disciplined for such violations. (Facts ¶ 61). Taylor, as a

non-supervisor, was not privy to disciplinary actions taken against others. In reality, others have been disciplined – and even more quickly and/or more severely than Taylor – for similar conduct. (Facts ¶ 36, 45, 89-90). This Court, in *Rager*, held that given the evidence of the plaintiff's deficient work performance and rule violations, even a technical violation of a policy is insufficient to give rise to an inference of a retaliatory motive. *Rager* at *8. The same is true here. Every discipline issued to Taylor cites the specific Department rule or policy he violated. The use of discipline and PIPs to correct performance deficiencies is not unusual, as described earlier. Given Taylor's repeated and escalating violations and performance concerns, the issuance of a PIP as a last effort to help Taylor improve was legitimate, non-retaliatory, and had nothing to do with his joining the Tapes Case approximately two years earlier, and thus, cannot give rise to an inference of a retaliatory motive.

### 2. The Legitimate, Non-Retaliatory Reasons for Term Limits

Ruszkowski implemented term limits to all non-patrol officer positions, including both ATF Task Force Officer assignments (not just Scott's) to ensure that all officers have opportunities to pursue specialized positions and to safeguard officer mental health by ensuring diversity in their assignments and exposure. (Facts ¶ 100). These are entirely legitimate reasons that have nothing to do with Scott's intervention in the Tapes Case. And, for these reasons, term limits apply to specialized assignments such as ATF Task Force Officers, all positions in the Detective Bureau, Training Division, Special Victims' Unit, the Metro Homicide Unit and Drug Investigation Unit (until those units were disbanded), the Strategic Focus Unit, and for School Resource Officer assignments. (Facts ¶ 101). This Court previously did not find First Amendment retaliation when a sheriff opened detective positions to others, and the Court should reach the same conclusion here. *Rager* at *1, 5.

**C.**     **Plaintiffs Cannot Show Any Action Was Pretext or a Lie to Cover Up Retaliation**

Plaintiffs' First Amendment Retaliation claims should also be dismissed because they cannot meet their burden of demonstrating that the reasons for every employment action are merely pretext to unlawful retaliation.

To show pretext, Plaintiffs "must present evidence suggesting that the employer is dissembling." *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir. 2011). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain [the action]." *Id.; see also Coleman v. Donahoe,* 667 F.3d 835, 852 (7th Cir. 2012) ("[I]t is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee."). Rather, Plaintiffs must point to evidence from which a reasonable jury could conclude that the Defendants' stated reasons were "phony" or a "lie." *Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995). "Pretext is more than a mistake on the part of the employer; it is a phony excuse." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004); *Rager v. Dukes*, No. 3:20-CV-43 JD, 2021 WL 6125124, at *8 (N.D. Ind. Dec. 28, 2021).

For example, in a First Amendment retaliation case, even if a defendant's reasons for terminating a sheriff's deputy are "foolish or trivial or even baseless," dismissal is still appropriate if the defendants honestly believed in their reasons for the action. *Milliman v. Cnty. Of McHenry*, 893 F.3d 422 (7th Cir. 2018) (affirming summary judgment on grounds defendants' non-retaliatory reasons were not pretextual). The court may not "second-guess" that decision. *Id.*

Here, there is no evidence in the record to which either Plaintiff can point that suggests the reasons for investigating and issuing discipline to Taylor, or opening up Scott's ATF Task Force Officer position to all officers to apply were "phony" or a "lie." For both Scott and Taylor, the

South Bend Defendants have presented multiple legitimate, nonretaliatory reasons for their actions that are both credible and defensible.

To start, the Department, like all employers, reserves the right to discipline its employees. Supervisors have discretion regarding whether to counsel with informal coaching or to issue formal discipline. (Facts ¶ 54). In multiple instances, this discretion worked to Taylor's favor. (*Id.*) Additionally, Taylor admitted in his deposition that neither Lancaster, Biggs, Ruszkowski, nor Miller ever told Taylor that he was being disciplined due to his involvement in the Tapes Case. (Facts ¶ 86). Likewise, Scott testified that he has no evidence to suggest, or any reason to believe, that the South Bend Defendants were involved in the selection of ATF Task Force Officers other than his own speculation that the "entire chain of command" must have had to approve the decision. (Facts ¶ 112). This conjecture is insufficient to establish pretext.

In Taylor's case, detective's reports are generally held to a much higher standard than other officers and detectives are required to submit reports within 24 to 48 hours, or 72 hours depending on the circumstance. (Facts ¶ 31, 33). When other detectives struggled with report writing, they were also counseled and if they did not reform, received written warnings or were removed from the Detective Bureau. (Facts ¶ 36). Taylor was treated the same, or more favorably, than any other detective who had issues with their reports. Those repeated issues, which took place over several years, in combination with his pattern and history of multiple policy violations and performance issues, led to the issuance of a PIP to *save* Taylor's employment. (Facts ¶ 65). Unlike the defendant agency in *Milliman*, which relied on one report to discipline the plaintiff, the South Bend Defendants relied on a years-long pattern of performance issues and policy violations which took place both before and long after Taylor's intervention in the Tapes Case.

Notably, Lancaster and Ruszkowski issued a letter of commendation to Taylor, praising

his work on a robbery case. (Facts ¶ 47). This was issued amidst Taylor's violations, with hopes it would *encourage* Taylor to rectify his persistent performance problems. (*Id*.) Moreover, the South Bend Defendants did not terminate Taylor – they issued a PIP, which he successfully completed and his employment continued. (Facts ¶¶ 6, 85).

Furthermore, Scott cannot establish that the institution of term limits to the two ATF Task Force Officer assignments – after the Department had already instituted term limits to all non-patrol officer positions – is pretext or a lie to cover up retaliation. Again, term limits apply to specialized assignments including ATF Task Force Officers. (Facts ¶ 101). The term limit changes were communicated through the Department's job postings and job descriptions. (Facts ¶¶ 102, 107). ATF Task Force Officers Scott and Bennett were allowed to stay on without reapplying longer than intended because they were simply overlooked. (Facts ¶ 103). When the positions were opened for applications, all officers, including Scott, were allowed to apply for the position. (Facts ¶¶ 102, 107). There is no evidence of any intent or attempt to prevent Scott from continuing as a Task Force Officer. In fact, Biggs and Lancaster treated Scott as a finalist for the role without even having to interview. (Facts ¶ 108). And Chief Ruszkowski was surprised to learn ATF did not select Scott to continue as a Task Force Officer. (Facts ¶ 111). Clearly, the intent of applying term limits to the Task Force Officer assignments was not to remove Scott. Further, Scott testified he does not have any reason to believe the Task Force Officer positions were opened to applicants for a reason other than to institute term limits, and he never asked Ruszkowski or his direct supervisor why the positions were opened. (Facts ¶ 104). Plainly, Scott cannot prove that the opening-up of his and Bennett's Task Force Officer positions, in alignment with the term limits for all other non-patrol officer assignments, was dishonest or somehow pretext for retaliation.

Although ATF chose not to retain Scott as a Task Force Officer, the South Bend Defendants

kept Scott in all South Bend Police Department assignments. (Facts ¶ 113-115). As a result, Scott was not denied any overtime other than the overtime he would have potentially received had the ATF decided to keep him on as a Task Force Officer. (Facts ¶¶ 4, 114-115). Scott continued to receive six hours of extra pay for sniper practice and explosive entry training, and between six and 36 hours of overtime as a training officer. (*Id*). Had the South Bend Defendants wanted to retaliate against Scott, they would have removed him from the assignments and denied the overtime they actually had control over, not the potential overtime Scott would have earned had the ATF chosen him to work with them. Clearly, the actions taken were not pretextual for retaliation.

**D.      The Individual Defendants are Entitled to Qualified Immunity**

"Qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known." *Hernandez v. Cook Cty. Sheriff's Office,* 634 F.3d 906, 914 (7th Cir. 2011). "The relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 915 (7th Cir. 2011). A government official will be protected by qualified immunity if either (1) the official has not violated the plaintiff's constitutional rights, or (2) the right at issue was not clearly established at the time. *Tolan v. Cotton,* 134 S. Ct. 1861, 1865-66 (2014). In the First Amendment context, courts look at whether defendants have an objectively reasonable belief that they are not violating the plaintiff's First Amendment rights. *Hernandez,* 634 F.3d 906 at 916. The plaintiff bears the burden of establishing the existence of a clearly established constitutional right. *Delgado v. Jones,* 282 F.3d 511, 516 (7th Cir. 2002). A defendant is on notice that his or her conduct is unlawful when the state of the law gives "fair warning" that the treatment of the plaintiff was unconstitutional. *Hope,* 536 U.S. at 741. It must be "certain" that the conduct was

unconstitutional and the "unlawfulness must be apparent." *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 620 (7th Cir. 2002). The test for whether the law is clearly established must be conducted based on the specific facts of the case, not a high level of generality. *Greenberg v. Kmetko*, 922 F.3d 382, 383-84 (7th Cir. 1991).

Plaintiffs allege that the retaliatory actions taken by Ruszkowski, Lancaster, Biggs, and Miller occurred in the course of their employment by the City of South Bend; the foregoing Defendants are each named as Defendants in their individual capacities except Chief Ruszkowski is named in his individual and official capacities. (Am. Compl. at ¶¶ 7-11, 32).

The individually named South Bend Defendants should be insulated from liability by qualified immunity because they did not retaliate against either Plaintiff for exercising their First Amendment rights. They are also entitled to qualified immunity because they did not know and should not have known that Plaintiffs were speaking on a matter of public concern. As explained above (in Section A), the content of the speech is the most important factor, and personal grievances of interest only to the employee fall short of protected speech. *Connick*, 461 U.S. at 146. The content of Taylor and Scott's speech was, by their own admission, about matters of private concern. Neither existing law nor precedent would suggest Scott and Taylor's intervention in the Tapes Case was protected First Amendment speech.

Nor did Biggs, Lancaster, Miller, or Ruszkowski have reason to believe or otherwise be on notice that issuing discipline for Taylor's continued performance and misconduct violated Taylor's clearly established rights. The Supreme Court noted multiple times that if a public employee's speech does not implicate a matter of public concern, "the Constitution does not insulate [the employee's] communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Similarly, Ruszkowski had no reason to believe or otherwise be on notice that opening up

the ATF Task Force Officer position to other officers (consistent with the term limits on all other non-patrol positions) violated Scott's clearly established rights.

Accordingly, even if there was some violation of Plaintiffs' First Amendment rights, which there is no such evidence to support, Biggs, Lancaster, Miller, and Ruszkowski are entitled to qualified immunity and all claims against them should be dismissed.

## IV. CONCLUSION

Quite simply, the South Bend Defendants' actions were warranted, legitimate, and in no way retaliatory for Plaintiffs' involvement in the Tapes Case.

Accordingly, the City of South Bend, Scott A. Ruszkowski, Individually and in his Official Capacity as Chief of Police, Timothy Lancaster, Jason Biggs, and Kayla Miller, respectfully request that the Court grant South Bend Defendants' Motion for Summary Judgment and dismiss Plaintiffs' claims in their entirety, with prejudice, and grant South Bend Defendants all further proper relief including its attorneys' fees and costs pursuant to § 502(g); 29 U.S.C. § 1132.

Respectfully submitted this 31st day of May, 2023.

FAEGRE DRINKER BIDDLE & REATH LLP

/s/ Angela N. Johnson
Angela K. Hall (#26991-71)
Angela N. Johnson (#32025-71)
FAEGRE DRINKER BIDDLE & REATH LLP
300 North Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: (317) 237-0300
Facsimile: (317) 237-1000
Email:   angela.hall@faegredrinker.com
          angela.johnson@faegredrinker.com

*Attorney for Defendants City of South Bend, Scott A. Ruszkowski, Individually and in his Official Capacity as Chief of Police, Timothy Lancaster, Jason Biggs, and Kayla Miller*

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2023, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Jeffrey S. McQuary
TOMPKINS LAW
608 E. Market St.
Indianapolis, IN 46202
317-631-6866
317-685-2329 (fax)
jmcquary@tlawindy.com

J. Taylor Kirklin
Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048
317-226-6333
317-226-6125 (fax)
taylor.kirklin@usdoj.gov

Daniel H. Pfeifer
PFEIFER MORGAN & STESIAK
53600 N. Ironwood Drive
South Bend, IN 46635
574-272-2870
574-271-4329 (fax)
dpfeifer@pilawyers.com

*Attorney for Defendant Merrick Garland
Acting Under Authority Conferred by 28
U.S.C. § 515*

*Counsel for Plaintiffs*

*/s/ Angela N. Johnson*